# Appeal of the Union Passenger Railway Company.

1. The complainants, by their charter dated April 8th, 1859, were empowered " to lay out and construct a railway from the intersection of Carpenter and Thirteenth streets; thence north along said Thirteenth Street to Columbia Avenue; thence west along said Columbia Avenue to Fifteenth Street; thence south along said Fifteenth Street to Carpenter Street; thence east along said Carpenter Street to the place of beginning; and with power also to lay out and construct a railway from the intersection of Fifteenth Street and Columbia Avenue to Ridge Avenue, . . . . and from Ridge Avenue along Master Street

[Appeal of the Union Passenger Railway Company.]

to Fifteenth Street, for the purpose of making connection with any company now authorized, or that may be hereafter authorized, to construct a railway on said Ridge Avenue."

By another section of the charter, other companies may connect with and use the complainants' road, "to complete their circuit," upon terms to be agreed upon between them, and failing that, the District Court shall fix the amount; and further, "and provided that for the purpose of completing their circuit on the route hereby authorized, and on no other route, the said company shall have the right to run their cars upon any other passenger railway now incorporated, or that may hereafter be incorporated, in said city, upon such terms as are above provided for, in the case of any other company using the road of the company hereby incorporated." Under this charter, the complainants constructed their main line in 1859, running south on Thirteenth, west on Carpenter, north on Fifteenth streets, and east on Columbia Avenue.

By an act of April 5th, 1870, the defendants were "authorized to continue and extend their track . . . . northward on Front Street to Columbia Avenue, thence westward along Columbia Avenue to Twenty-second Street, with the privilege to lay a double track on Columbia Avenue west of Seventh Street, thence southward along Twenty-second Street to Master Street, thence eastward along Master Street to Seventh Street."

November 9th, 1870, the complainants and defendants, "for their mutual accommodation, as well as to obviate the necessity of occupying the said avenue (Columbia) and the said street (Master) with several railroad tracks," entered into an agreement, under the terms of which the said companies should "jointly build, own, and use one railway track, to be laid in each said avenue and street." This agreement provided, *inter alia :* "Both parties hereto will run their cars eastward along Columbia Avenue, and westward along Master Street, unless prevented by competent authority; . . . . and if either party shall lay another track on said streets, such party shall keep in order and repair three-fourths of the streets and tracks wherein such additional track is laid. . . . . If the said Thirteenth and Fifteenth Streets Railway Company shall choose to abandon the use of said tracks, then the said Union Company will purchase their part of the same, at a price to be fixed by three persons, one of whom shall be selected by each party hereto, and the persons so selected shall choose a third."

From that time the two companies ran their respective cars according to the terms of the agreement. The defendants constructed another track upon Columbia Avenue, to the northward of the one owned in common, upon which they ran their cars westward.

*Held,* that under their respective charters the complainants were entitled in reversing the direction of the running of their cars to connect with the defendants' north track on Columbia Avenue and run westward on it to Ridge Avenue; to construct and build a separate track on the south side of Master Street, to be operated eastward; and to remove and relay the joint track in use upon Master Street to and upon the north side of said street, they paying the costs and expenses of the construction and connections.

2. The fact that complainants originally elected to run their cars in certain directions does not, at the suggestion of another corporation, bar them from diametrically reversing the order of their running.

3. Nor in such a suit is the fact that complainants did not construct their branch track for eleven years after the date of their charter to be considered an abandonment by *non user.*

4. *Semble,* that if complainants' chartered rights had been affected by such *non user,* the effect of the agreement would have been, *inter partes,* to vitalize them.

5. A railway corporation which accepts a charter, finding a previous railway corporation in possession of the streets, cannot, in equity, plead want of notice of the charter of its predecessor and the extent of its franchise.

6. The agreement between the parties was one which, by its terms, could be rescinded upon notice.

7. The jurisdiction of a court of equity in the case is not affected by the special legislation contained in the provisions of complainants' charter.

8. North Branch P. R. W. Co. *v.* City P. R. W. Co., 2 Wr., 361, distinguished.

[Appeal of the Union Passenger Railway Company.]

Before SHARSWOOD, C. J.; MERCUR, GORDON, PAXSON, TRUN-KEY, STERRETT, and GREEN, JJ.

Appeal from the decree of the Court of Common Pleas, No. 4, for *Philadelphia County.*

Bill in equity and amendments, filed by The Thirteenth and Fifteenth Streets Passenger Railway Company against The Union Passenger Railway Company, asking for a decree authorizing the complainants:

I. To change their connection with the defendants' road at the intersection thereof, at Columbia Avenue and Thirteenth Street, from the south track thereof now running eastward to the north track thereof running westward, between said Thirteenth Street and the Ridge Avenue.

II. To declare the right of the plaintiffs to construct a separate line of road on Master Street, running eastward from Ridge Avenue to Fifteenth Street, instead of westwardly, over a joint road as at present run, and thence southward.

III. And comprising the above to enjoin the defendants from interfering with the plaintiffs in a reconstruction of their said road, whereby they propose to reverse the order of running their cars, and to run the same up Thirteenth Street to the defendants' north track on Columbia Avenue; thence westward along and over the same to the Ridge Avenue; thence connecting with the Ridge Avenue road to Master Street; there to construct a new road on the south side of said Master Street to run eastwardly to Fifteenth Street; and thence southwardly down Fifteenth Street, instead of up as heretofore.

After answer, the case was referred to William Nelson West, as examiner, and subsequently to Pierce Archer, as master, with power to recommend a decree.

The master found the facts as follows:

The charter of the plaintiffs bears date April 8th, 1859, P. L., 429. It empowered them "to lay out and construct a railway from the intersection of Carpenter and Thirteenth streets; thence north along said Thirteenth Street to Columbia Avenue; thence west along said Columbia Avenue to Fifteenth Street; thence south along said Fifteenth Street to Carpenter Street; thence east along said Carpenter Street to the place of beginning; and with power also to lay out and construct a railway from the intersection of Fifteenth Street and Columbia Avenue to Ridge Avenue, . . . . and from Ridge Avenue along Master Street to Fifteenth Street, for the purpose of making connection with any company

now authorized, or that may be hereafter authorized to construct a railway on said Ridge Avenue."

By the tenth section of this charter, other companies may connect with and use the plaintiffs' road " to complete their circuit," upon terms to be agreed upon between them, and failing that, the District Court of the county shall fix the amount; and further, " and provided that for the purpose of completing their circuit on the route hereby authorized, and on no other route, the said company shall have the right to run their cars upon any other passenger railway now incorporated, or that may hereafter be incorporated, in said city, upon such terms as are above provided for, in the case of any other company using the road of the company hereby incorporated."

Under this charter the plaintiffs, in 1859, constructed their main road on Thirteenth Street, running south; and on Carpenter Street west, and on Fifteenth Street, running north, and east along Columbia Avenue, soon after the date of their incorporation. The branch line on West Columbia Avenue and Master Street was not built at that time, nor until 1870.

The charter of the defendants bears date April 8th, 1864, P. L., 297, five years after plaintiffs' charter. By it they were authorized to build and construct their road over certain streets, not including those now in question. The ninth section contained the usual clause authorizing connection with other roads. Under this charter defendants built their road, and operated it in other parts of the city.

By an Act of April 5th, 1870, P. L., 929, eleven years after plaintiffs' charter, the defendants were "authorized to continue and extend their track . . . northward on Front Street to Columbia Avenue; thence westward along Columbia Avenue to Twenty-second Street, with the privilege to lay a double track on Columbia Avenue west of Seventh Street; thence southward along Twenty-second Street to Master Street; thence eastward along Master Street to Seventh Street; and the said company is authorized from time to time to extend and continue their track westward along Columbia Avenue and Master Street, and use any street west of Twenty-second Street to form a circuit," etc.

It thus appears that both plaintiffs and defendants, by acts of Assembly, were authorized to occupy the disputed streets for the purposes of railways; the plaintiffs by the Act of 1859, the defendants by an Act of 1870, eleven years later. It was then (1870) for the first time that the question was mooted between these two companies as to the right of

way over these two highways. On the 9th of November, 1870, they entered into an agreement, which provided:

" Whereas the said companies have each been authorized by the acts of the General Assembly of the Commonwealth of Pennsylvania incorporating them respectively, or by acts supplementary thereto, to lay passenger railway tracks on Columbia Avenue from Fifteenth Street to Ridge Avenue, and on Master Street to Ridge Avenue, or on parts thereof.

" And whereas the parties hereto for their mutual accommodation, as well as to obviate the necessity of occupying the said avenue and the said street with several railroad tracks, have made an arrangement by which both of the said companies may jointly build, own, and use one railway track to be laid in each said avenue and street.

" Now this agreement witnesseth, that the said companies, for and in consideration of the covenants and stipulations hereinafter contained and mentioned, and in favor of each other respectively, to be kept, performed, and observed by the other party, do for themselves and their successors each to the other mutually promise and agree in manner following, that is to say :

" *First.* The Union Railway Company will build and lay a track on Columbia Avenue from Seventeenth Street to Ridge Avenue and on Master Street from Fifteenth Street to Ridge Avenue ; when the same is finished and completed the Thirteenth and Fifteenth Streets Railway Company will pay one half of the actual cost of so building and laying tracks. And, as the said Thirteenth and Fifteenth Streets Company has already laid such track on Columbia Avenue from Fifteenth to Seventeenth Street, the actual cost of laying and building the same shall be deducted from the amount which the said Thirteenth and Fifteenth Streets Company are to pay to the Union Company for their share of the actual cost of building the tracks which the Union Company have herein agreed to build. The said Union Company agree to complete the said building and laying on or before the tenth day of December, 1870. The tracks so built and paid for shall be owned jointly by the parties. Any curves or turn-outs which either party may require shall be built by the party so requiring the same.

" *Second.* The single track on Columbia Avenue now belonging to and used by the Thirteenth and Fifteenth Streets Railway Company may be used by the Union Railway Company whenever it desires to do so, upon said last-named company paying to the former company half of the present value thereof, to be settled and paid when the mutual accounts referred to in this contract are adjusted. If the par-

ties cannot agree upon this value, it shall be settled in the manner provided in the fifth item of this contract; when so paid for, said single track shall be jointly owned by both companies.

" *Third.* Each party hereto may run as many cars on the said tracks as they think fit. Cars shall be run on said tracks at a rate of not less than five miles per hour. No cars shall delay on the route, and no part of either of said tracks shall be used for a stand without the consent of both parties hereto. Both parties hereto will run their cars eastward along Columbia Avenue and westward along Master Street unless prevented by competent authority.

" *Fourth.* The said streets and tracks to be kept in order and repair as follows, namely: Each party hereto shall so keep in order and repair one equal half of each street and track, but if one of said parties shall exclusively use the said tracks, during such exclusive use such party shall keep the whole in repair. And if either party shall lay another track on said streets, such party shall keep in order and repair three-fourths of the streets and tracks wherein such additional track is laid.

" *Fifth.* If the said Thirteenth and Fifteenth Streets Railway Company shall choose to abandon the use of said tracks, then the said Union Company will purchase their part of the same at a price to be fixed by three persons, one of whom shall be selected by each party hereto, and the persons so selected shall choose a third. And if either of the parties hereto neglect to make such selection and appointment, then the other party may appoint the two, and they shall choose a third."

Under this agreement, and in accordance with its terms, the two corporations have continued to operate their respective cars over the now disputed railway route. The defendants constructed a track, to the northward of the one in common use, upon Columbia Avenue, on which their cars ran westward. On May 2d, 1876, the plaintiffs, through their president, addressed to the defendants' president a letter asking: "I desire to know from you whether you will allow our cars to run west over your track on Master Street, from Thirteenth to Fifteenth streets, upon our paying you a proper rental therefor, or such other compensation as you may fix upon, giving due security not to interfere in any way with the running of your own cars at this point."

This was declined by defendants, by letter of May 5th, 1876, on the ground of the absence of a franchise in the plaintiffs, over these streets, from the Commonwealth.

[Appeal of the Union Passenger Railway Company.]

On June 22d, 1876, the plaintiffs addressed the defendants as follows:

"As the Union Passenger Railway Company have declined, through your letter of May 5th, to allow us to run our cars over their two squares of track on Master Street, between Thirteenth and Fifteenth streets, and as we find it is necessary to run north on Thirteenth and south on Fifteenth Street, to accommodate the travelling public along our line, our board of directors have determined to run west on Columbia Avenue to Ridge Avenue, thence southeast to Master Street, and east on Master as far as Fifteenth, our company being authorized to run on all of these streets. In order to do this it will be necessary for us to run our cars west on the northernmost of the two tracks on Columbia Avenue, as you run west upon that track, and also to build a new track on Master Street, from Ridge Avenue to Fifteenth Street, which we propose doing. Please to let me know at what time I can make the necessary connections with your north track on Columbia Avenue, at the corners of Thirteenth Street and of Ridge Avenue, to run our cars on it instead of the south track which we are now using."

To this letter the defendants, on July 12th, 1876, replied, denying the claim of right, on the ground that a "franchise has not been granted by the Commonwealth."

There was a difference of opinion among the citizens along the line of the roads as to the effect upon public convenience by the proposed change of direction, and the injury to private property said to be a probable result of placing two tracks on Master Street. The preponderance of opinion as to the service to the public by the proposed change of direction was in its favor; on the question of injury to private property on Master Street, opinions varied.

The master reported, *inter alia:* "It cannot be doubted that if the plaintiffs had originally projected their road on the plan now desired, that no reasonable objection or question could have been made by any one, either as to the direction in which they should operate their cars on their main line, or as to the occupancy, in their own chartered right, of the branch line and streets their right to which is now disputed. The only curtailment of their absolute and exclusive use of these highways for railway purposes, is contained in section 10 of their charter, which subjects portions of their road to be used by other roads to make connections, 'to complete circuits,' upon compensation being made, etc. Their right thus being vested by their charter, which they accepted and executed, and they having elected to run their cars in a certain direction over their road, and, as to a por-

tion of it, not having immediately availed themselves of their chartered right to build their branch road to Ridge Avenue, *via* Columbia Avenue and Master Street, do, or do not, these facts operate to limit or control their grant of powers as written in their charter?

" As to the first objection, does the fact that they elected to run their cars north on Fifteenth, east on Columbia Avenue, south on Thirteenth, and west on Carpenter Street, now bar them from reversing the order of their running diametrically? The defendants say it does, but cite no authority for the position.

" If the right was originally perfect to run as now proposed, it is difficult to see what act of commission or omission has operated to destroy it, particularly at the suggestion of any one but the sovereign, and then only in a proper proceeding for the purpose. So lately as Long's Appeal, 6 Norris, 114, the trite doctrine of Dartmouth College *v.* Woodward, 4 Wheaton, 636, is re-announced for the thousandth time, and so long as contracts are upheld by courts, so long will charters, accepted and acted on, be protected and executed as contracts are. Nay, more, even in the case of an attempted repeal by the legislature, it still remains for adjudication judicially whether the *casus fœderis* has occurred: Commonwealth *v.* Pittsburgh and C. R. R., 8 P. F. Smith, 26; Hestonville Railway *v.* City, Legal Intelligencer, 1879, p. 452.

" There is no limitation in the charter as to what way the cars shall run over the road; there can be no question as to its location being in accordance with its charter; and, even had it not been, none but the Commonwealth could call the company to account: Railroad *v.* Speer, 6 Smith, 325. If it be, as is there said, that charters are to be liberally construed, that the right to alter or extend the road over specified routes is wholly in the discretion of the managers, and that it did not strip itself of its corporate power by the execution of it in a manner which it subsequently found it convenient or necessary to alter, then it would seem that there is but little to consider further as to this objection: 1 Redfield on Railways, 673; Abbott's Digest, Corporations, 339, sec. 12.

" The other branch of this question was as to the effect upon their charter-right of their delay in building the branch on west Columbia Avenue and Master Street, which they did not build for eleven years after their charter, and then only in conjunction with the defendants. The only ground upon which this objection rests is that of abandonment by *non user*, which, if given effect in the present case, would be

[Appeal of the Union Passenger Railway Company.]

to declare void, *pro tanto*, in a collateral proceeding, a charter granted by the Commonwealth. This may not be done in a private suit, or at the instance of any one but the Commonwealth : Angell and Ames on Corporations, 730, 731.

" The cause of forfeiture must be judicially ascertained and declared in a proceeding directly against the company, so that it may have an opportunity to answer : Ibid., 746 ; Turnpike Co. *v.* McConaby, 16 S. & R., 140 ; Redfield on Railways, 547–8, note 6.

" But this very question has been passed upon judicially by the Supreme Court in the case of The Thirteenth and Fifteenth Streets Railway Company, plaintiffs in error, against the Ridge Avenue Company *et al.*, 7 Phila. R., 620, and in that case the Union R. W. was also a party defendant. The same issue of law was there raised, that by the *non user* of the franchise for eleven years in not building the road and making the same connections with the Ridge Avenue Road under their charter, that the plaintiffs had abandoned and forfeited their right. On a bill for injunction at *nisi prius*, an injunction was granted in favor of the Ridge Avenue Road, to prevent the connection by plaintiffs with their road. The ground of the decision below was " upon the failure within a reasonable time to exercise the right of election," and its non-exercise. The cause was removed to the Supreme Court, and there the judgment below was reversed, and the injunction dissolved : see Writ of Error, January Term, 1871, No. 19, MS. No opinion was delivered.

" Upon the reversal above referred to, the plaintiffs here, under their .contract with the Union Road, of November 9th, 1870, went on and made the connection with the Ridge Avenue Road, and have since been operating the line without disturbance or molestation. It is apparent, then, upon this branch of the case, that there would be no equity in adjudging in this proceeding that there was a partial forfeiture of the charter of the plaintiffs by reason of *non user* for the period of eleven years. If, indeed, in a case presented by the proper party, it appeared that after a lapse of time sufficient to presume abandonment, the chartered rights of other grantees of the Commonwealth were being affected by a resuscitation of the dead charter of the plaintiffs, then, perhaps, a chancellor might hesitate to protect the derelict corporation which had not asserted or exercised its written powers for the public benefit. But this is not such a case ; rather the reverse, for here the agreement referred to has practically vitalized the charter, if it ever needed it, so far at least as it affects the parties to the contract by a full recognition of the plaintiffs' *status.*

[Appeal of the Union Passenger Railway Company.]

" It is to be remembered that this voluntary contract leaves both parties free to resume their original antecedent position. It gives to the plaintiff, when it ' chooses,' the right of withdrawal, and carefully defines the terms upon which either may withdraw from the joint use of the tracks. Surely it estops either party from pleading it as a waiver of right, or cause of forfeiture, during its recognized existence.

" That this contract between the two companies was not *ultra vires* is abundantly shown by the case of the Hestonville, Mantua and Fairmount Passenger Railway Company *v.* The City of Philadelphia, *Legal Intelligencer,* 1879, p. 452, the most recent adjudication on several of the points of the present controversy.   In that case, the Hestonville Company was formed by the merger with it of ' The Fairmount Passenger Railroad Company,' and ' The Fairmount and Arch Street Passenger Railway Company,' and the three were consolidated under the Act of May 16th, 1861, Purdon, 1222.   One of the questions raised, and elaborately argued and considered in that case was, whether the Act of 1861, ' relating to railroad companies,' applied to city passenger ' railways,' authorizing consolidation of ' railroads;' and it was decided most broadly in the affirmative.   The effect of this decision on this point, it may be remarked in passing, is to make all appropriate legislation referring to ' railroads ' equally applicable to all kinds of city passenger ' railways ' or ' railroads,' and, therefore, it brings in operation, in the present case, the Act of 17th February, 1870 (Purdon, 1233, pl. 107), making it ' lawful for any railroad company, or companies, created by the laws of this Commonwealth, from time to time to lease other roads, or enter into any other contract with any other railroad company, on such terms and conditions as may be agreed upon,' etc.   It follows, then, that the agreement of November 7th, 1870, in the case in hand, was executed in conformity to this act of Assembly, and is authorized by its terms, it not being violative of any condition of either company's charter.

\*      \*      \*      \*      \*      \*      \*

" The statutory mode of procedure under the Act of April 1st, 1870, for adjudication of forfeiture of chartered rights at the suit of the attorney-general, upon the suggestion of any party whose rights or interests are affected, is ample (Purdon's Digest, 293, pl. 66), while the special proceedings, on injunction, authorized by the Act of 19th June, 1871 (Purdon, 288, sec. 39), to determine ' whether any such corporation does in fact possess the right or franchise at the suit of any person or corporation having an interest,' remains fully open as a remedy to any aggrieved corporation.

"But the case of The Hestonville, Mantua and Fairmount Passenger Railway Company *v.* The City, *supra*, is conclusive with the master upon this question of forfeiture by *non user* or abandonment.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"It was said by TRUNKEY, J., in the case cited, that the charter 'required no continuous use of a double track, on pain of forfeiture of the right;' and the same may be said with as much, if not more force here, where, as it would appear, the streets were not so far opened and completed on the branch road, at the date of incorporation, as to permit of the permanent construction of the tramway thereon.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"In the argument, the case of The North Branch Passenger Railway Company *v.* The Philadelphia Passenger Railway Company, 2 Wright, 361, was also strongly relied on by the defendants, in connection with their argument of *non user*, as authority to show that the grant of power, in section 10 of plaintiffs' charter, to connect with roads thereafter to be constructed, was a mere legislative promise of a thing not *in esse*. STRONG, J., dissented. The case, in the opinion of the master, does not rule the present; the facts are radically different. In that case the injunction was refused, because the defendants' charter was a grant exclusively of certain specified streets, just the reverse of the present, where the grant to the plaintiff is of the specified streets in question, which was not the case of the plaintiff in 2 Wright; again, in that case, there being no specific grant of the streets to the plaintiff, but an exclusive grant to the defendant, the legislative permission to connect with any subsequently chartered road was a mere legislative license, revocable and revoked by the legislature erecting the new corporation, and giving it exclusive occupancy of its highway: R. R. *v.* City, 11 Wright, 324; E. and N. E. R. *v.* Casey, 2 Casey, 287; Packer *v.* Sunbury and Erie R. R., 7 H., 211.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Third. Having, then, considered the questions of *non-user* and reversal of the direction of running plaintiffs' cars, with reference to the powers contained in their charter, the master is of opinion with the plaintiffs on both of these points of controversy. How, then, does it stand upon the defendants' supplement to their charter granted in 1870, eleven years after? They were incorporated 8th April, 1864 (P. L., 300), were required to conform to the gauge of other roads, and were authorized to cross or connect with any other

road. In 1870 (P. L., 929), they were authorized to extend their road to the territory occupied by the plaintiffs, more than a mile from defendants' originally chartered line. At this time (1870), the plaintiffs had built and operated for years a single track on Columbia Avenue, from Fifteenth to Thirteenth streets. Under their charter the defendants were authorized to run over this track, after arranging as to compensation, the power being given for the purpose 'of completing a route or making a circuit.' Whether this piece of road fell within that description it is not necessary for the master to inquire. It is important only as an existing fact of occupancy of a portion of the road now in dispute, for the purpose of bringing home to the defendants notice of the charter of the plaintiffs in its whole extent as affecting the disputed streets prior to the charter and amended charter of the defendants. A corporation which accepts a charter, finding a previous corporation on the ground in possession, cannot in equity plead ignorance that they had not actual notice of the charter of their predecessor and the extent of their franchise before making improvements on the strength of their own subsequent charter: City *v.* Railway, 2 W. N. C., 283.

"Indeed, a strong argument might be made to this effect from the ninth section of defendants' supplemental charter of 1864, giving the right of extension over the streets in question, because of the provision therein for the purchase by them of one-half the track of the prior companies, presumably the plaintiffs'.

"The defendants are, therefore, to be regarded as accepting their charter with full notice of the plaintiffs' franchise, and are to be held to whatever consequences flow from that knowledge and notice; and principal among these is that, prior to the vesting of their franchise, the plaintiffs had acquired valuable rights, subject to which the defendants had accepted their charter, which even the legislature itself could not annul, unless "in such manner, however, that no injustice shall be done to the corporators:" Constitution, 1838; article I., section 26.

"Fourth. But it was further pressed, on behalf of the defendants, that whatever the status of the plaintiffs had been, or whatsoever their rights were under their charter, that by the agreement of November 9th, 1870, the respective rights of both companies were determined and defined as therein provided; and that they are mutually bound to their covenants therein contained, as much so as if it had been originally prescribed in their respective charters of incorporation.

"Waiving the question as to how far the board of directors of a corporation can, without the consent of the stock-

holders, surrender any valuable part of its franchise, even for
a consideration (Angell and Ames on Corporations, 233), it
becomes necessary to consider the scope and effect of this
agreement.

"As we have already seen, it recited, by way of preamble,
that ' each company had been authorized to lay passenger
tracks, etc.,' on the streets in question; that, for ' mutual
accommodation,' and '.to obviate the necessity of several
tracks ' on the same street, that an ' arrangement had been
made to jointly build, own, and use one railway track in
each avenue and street.' Then followed the agreement to
equally pay the cost of construction and repairs of road and
streets, and to run the cars jointly west on Master Street,.
and east on Columbia Avenue. If either company ex-
clusively used the tracks, then it was to pay all repairs of
road and streets. If either shall lay ' another track ' on
said streets, such party shall keep in order and repair three-
fourths of such street and track, and if the Thirteenth and
Fifteenth Streets Company shall choose to abandon the use
of said tracks, then the Union Company will purchase and
pay for their part thereof.

"It will be remembered that this agreement was made pend-
ing the litigation of plaintiffs with the Ridge Avenue Com-
pany, heretofore adverted to ; that the plaintiffs had already,
as it recites, actually constructed the road on Columbia Ave-
nue, from Fifteenth to Seventeenth streets, besides the two
squares in use on that avenue between Thirteenth and Fif-
teenth streets for years by them, and which the defendants
proposed to use, paying one-half cost thereof.

"The agreement is a very clear and perspicuous document,
and to the mind of the master, was provisional in its truest
sense, and not meant by either party to be permanent or de-
claratory of their ultimate corporate rights. In its every
line, almost, it recites its own temporary nature, and pro-
vides for its own dissolution as a contract, at the will of
either party. Its object is declared to be ' mutual accom-
modation ' and avoidance of a multiplicity of tracks on the
same street. An equality of interest is admitted, and the
right of the plaintiffs to ' choose to abandon' the joint occu-
pancy, to be compensated for their share of construction and
' lay another track on said streets,' is expressly recognized
in terms in paragraphs 3 and 4, and upon either party
exclusively using the track, they shall keep the whole in
repair, and upon laying a separate additional track, keep
three-fourths of the streets and track in repair.

"To say that this agreement is perpetual and binding on
both parties without limit is to contradict its express lan-

guage, which declares otherwise. While it is to be favorably construed and upheld as a treaty of peace, yet it leaves both parties equally free at any time, with or without cause, and according to their own judgment, to dissolve the joint relation as to the occupancy of the highways in question.

" It does not even require a prescribed term of notice of an election to withdraw from the compact, and when, by the letters of the plaintiffs to defendants, of May 2d and June 22d, 1876, they informed them of their intention to change the running of their cars and to build a new track on Master Street, it was the most unmistakable notice of intended abandonment that possibly could be given, and, being within the reserved powers of the contracting parties, the binding force of the covenants was at an end. It is plain, therefore, that neither party is longer bound by the contract as to joint occupancy, since the election of a competent party to rescind it, and notice thereof has been duly given and received. So long as it existed, doubtless, the charter rights of the parties were *inter partes* suspended, at least so far as a chancellor would interfere to enforce them, but now that the contract is annulled, they are relegated to their respective rights, which are to be determined upon their written charters, which have already been considered.

" Fifth. A remaining argument, made for the defendants, was: ' That, inasmuch as the charter of the plaintiffs, section 10, provides that, if the parties cannot agree, then the District Court shall appoint three persons, who shall fix the amount to be paid to the parties owning said road;' that, therefore, a special jurisdiction is created, where resort must first be had, and the remedy there sought, and not in a court of equity.

" This argument would have controlling force in a proper case, but it is conceived that this is not that case. It is not the case described in the act of a new company desiring ' to connect with' another already constructed and operated road, authorized by its charter to negotiate with an old corporation, for compensation, for a legalized invasion of its road-bed and track, in common with ' the parties owning said road;' the rather it is a contract between two companies having similar chartered rights to the same territory, agreeing to construct a new road at their joint equal cost, for their joint common use; the older, plaintiffs' company, contributing its already constructed road on Columbia Avenue, from Thirteenth to Seventeenth streets, at its cost price, for the common use. It was not, as plaintiffs' charter terms it, a case where the new company ' shall have the right to run their cars upon any other passenger railway,'

but it was the case of a company consenting to use its franchise and road partly built jointly with another newly organized company, upon terms of equality as to cost of the old road, and the new extension contemplated.

"When this agreement was made the Union road had no passenger railway built or constructed on this route, over which plaintiffs could claim to 'have the right to run their cars.' On the contrary, it was 'to be built and owned' by the plaintiffs and defendants jointly, so that in no sense could the plaintiffs have petitioned the District Court to appoint three persons to fix the amount 'to be paid to the parties owning said road.'

"They were owners themselves, and as soon as built, they were seised as tenants in common *per tout*, and, therefore, could not petition to pay themselves.

"But even if this were not so, the argument would still be with the plaintiffs, for, clearly, when in answer to the letters of the plaintiffs, of May 2d and June 22d, the defendants, in their two answers of May 5th and June 6th, 1876, squarely planted themselves 'upon the absence of a franchise (to the plaintiffs) granted by the Commonwealth,' and not upon a disagreement as to 'terms to be agreed on by the parties,' then the special jurisdiction of the District Court never had an existence, for the occasion never happened to give it birth. A repudiation of all right to the 'franchise' operated to dispense with any negotiation as to 'terms,' upon the same principle that an agreement to arbitrate as to amount is waived by a total denial of performance: Mentz *v.* Insurance Company, 29 Smith, 478.

"It follows, then, that, in the view of the master, the jurisdiction in equity is not affected by the special legislation referred to. The right being denied *in toto*, that must first be adjudicated, for how can the 'parties interested agree upon 'terms' so long as one of them refuses to accept any terms? When the question of right is settled, then, if necessary, but not before, can the question of terms properly arise for consideration. It was hinted, but not pressed on argument, that the contract of November 9th, 1870, was an execution of the power given to the companies as to the joint use of the tracks, and undoubtedly there would be much force in this, and equity would leave the parties where they placed themselves, if the contract itself had not left it optional to either, at their own will, with or without or against reason, to dissolve the contract, and withdraw from occupation under it, and a chancellor would be loath, indeed, to exercise the powers now invoked, had their right to withdraw not been mutually and expressly reserved by both parties.

[Appeal of the Union Passenger Railway Company.]

As was said by Thayer, J., in Railroad *v.* Railroad, 2 W. N. C., 286, in a similar case: 'If, however, the plaintiff shall refuse to adjust the matter in an amicable manner, or if the parties should be unable to come to any agreement, the Court will not hesitate, upon a proper bill being filed, to exercise the equity powers which give them complete control over the subject.'

"And thus it is here—the defendants deny the franchise of the plaintiffs, the provisional agreement is at an end, as has been seen, and the parties are relegated to their respective corporate rights under their charters.   In such a case equity will take jurisdiction independently of its special powers as to corporations under the Act of 1836.

"The disposition of this argument leads to a judgment by the master, upon the bill, answer, and proofs, in favor of the plaintiffs.

"Should the view entertained by the master be finally approved, the result will be a system of almost continuous alternate lines as to direction north and south ; whereas, at present the lines in proximity do not alternate.   Thus, if the change proposed by this decree is accomplished, the lines running on streets northward, in the populous sections of the city, will be Third, Fifth, Eighth, Eleventh, Thirteenth, Sixteenth, Eighteenth, etc., and southward, Second, Fourth, Sixth, Seventh, Tenth, Twelfth, Fifteenth, Seventeenth, etc. Upon the argument of public accommodation and convenience, this result has considerable force, yet it should not control the decision as to vested legal rights under written franchises, if the case was otherwise against the right to change."

The master recommended a decree in accordance with these findings.   The defendants filed exceptions to his report, which the Court below, ELCOCK, J., dismissed, saying, *inter alia :*

"It will thus be seen that this agreement was entered into for some temporary purpose, and contemplates, without ambiguity, independent action as to the construction of additional tracks by either party.   It is, therefore, difficult to see why objection is made by defendant to the proposed action of the plaintiff.   Their rights are equal over both streets, and no question of forfeiture of any right can arise (*vide* the case of Thirteenth and Fifteenth Streets Railway Company *v.* The Ridge Avenue Railway Company, 7 Phila., 620). The business of the company defendant is not interfered with, nor can they be compelled to contribute anything to the expense of the alteration.   Nor do we see any other mode by which the plaintiff can effect a change of its route,

for its corporate rights do not extend to running a track from Thirteenth Street west to Fifteenth Street on Master Street, by which, it has been argued, the plaintiff might effect a connection, and thus continue to run west on Master and east on Columbia Avenue. The right, therefore, sought by plaintiff appears to be reserved in the agreement, which, if it had otherwise granted away for a good consideration, would be binding upon it.

" It must be recollected that the present controversy is to determine the right simply as between the two companies. What right the city of Philadelphia may have to prevent such proposed construction without the consent of its councils does not arise in this case, and cannot now be determined.

" The right of the parties thus standing as if one company had laid its track upon Master Street, it is argued that the plaintiff has no right to move, shift, or relay the present track, or build a new track on Master Street, without the consent of the defendant.

" But this question has so lately been before this Court, in the case of The Continental Railway Company v. The Union Railway Company, 33 Legal. Int., 43, and received such elaborate discussion in the opinion of our learned President judge, both as to the rights of the companies and the powers of a court of equity over the subject, that any further examination of the subject is entirely unnecessary. Courts of equity are essential to adjust such rights between corporations.

" The present case is so fully and ably considered in the report of the learned master, that we are entirely safe in affirming all his findings, and in making the decree he reports, save in one particular, viz., the amount to be paid by the defendant for plaintiff's interest in the abandoned Master Street track. This must be determined in accordance with Section V. of the agreement between the parties, of November 9th, 1870."

The Court then made the following decree:

" It is now ordered, adjudged, and decreed:

" 1. That the plaintiffs have right to run their cars from Carpenter Street northward on Thirteenth Street to Columbia Avenue, there to connect with the defendant's north track and run westward to the Ridge Avenue, and thence along Ridge Avenue to Master Street, and there to erect, construct and build a separate track, of uniform gauge, not nearer than five feet on the south rail from the south curb of said Master Street, to be operated eastward; and thence along said Master Street to Fifteenth Street, there connect-

ing with their road; to run their said cars southward on said Fifteenth Street, and eastward on Carpenter Street to the place of beginning at Thirteenth Street.

" 2. That all the costs and expense of said construction and connections are. to be paid by the said plaintiff.

" 3. That the plaintiff have the right to remove, shift, relay, and rebuild the said joint track, now in use on Master Street, to the north side of said Master Street, the north rail thereof not to be nearer the north curb-line than five feet.

" 4. That the amount to be paid by defendant to plaintiff for its interest in the track abandoned by it upon Master Street shall be fixed and determined by three persons, one of whom shall be selected by each party, and the persons so selected shall choose a third. And if either of the parties neglect to make such selection and appointment, then the other party may appoint the two, and they shall choose a third.

" 5. That if the parties cannot amicably agree upon the amount to be paid by the plaintiff to the defendant for any other loss or injury done to it by the disturbance of its road in the course of reconstruction, it shall be determined by Pierce Archer, Esq., to whom the motion is referred as examiner, to take testimony and report his views thereon, and the amount to be paid.

" 6. And it is further ordered, that the costs of this suit be equally divided between the plaintiff and defendant."

From this decree the defendant appealed, assigning as errors that the Court erred in dismissing the exceptions to the report of the master, setting forth that he erred:

1. In holding that the plaintiff corporation has any right to run its cars over the tracks of the defendant corporation without the consent of the latter.

2. In holding that there is any jurisdiction in a court of equity to compel defendant corporation to change the running of cars on its own tracks.

3. In holding that this contract, a copy whereof is annexed to the answer, does not conclude the right of property in the tracks on Columbia Avenue, and the running-direction of cars by both corporations on Columbia Avenue and on Master Street.

4. In reporting that plaintiff has a right to connect with the north track of defendant on Columbia Avenue and run westwardly thereon to Ridge Avenue.

5. In reporting that plaintiff can lay any additional rail on Master Street without the consent of the city of Philadelphia.

[Appeal of the Union Passenger Railway Company.]

6. And that the Court erred in not dismissing plaintiff's bill.

*D. W. Sellers*, for appellant.

The claim of the plaintiff that it can run its cars over the track of the defendant, because of the provision in its charter authorizing it to complete its circuit, has been expressly decided otherwise by this court: North Branch Pass. R. W. Co. *v.* City Pass. R. W. Co., 2 Wr., 361.

The right to run cars on its own tracks belongs exclusively to the grantee holding the franchise, where no burden is expressed in the charter: Citizens' Coach Co. *v.* Camden Horse R. R. Co., 33 N. J. Equity Rep., 267.

The decree gives the property of a private corporation to another for private purposes.

There is no equitable ground of jurisdiction unless there be clear legal rights in each on the same roadway.

The contract recites that each of the corporations is authorized to lay tracks on Columbia Avenue, and that both of the said companies have made an agreement to "jointly build, own and use one railway track." Under this contract, each was the owner of a moiety of the south track. The one on the north was built wholly by the Union, and until now exclusively used by it. As each according to the contract had the right to lay a several track, why is not the consideration therein expressed for the one railway track to be jointly owned and used, " that it was for their mutual accommodation as well as to obviate the necessity of occupying the said avenue with several railroad tracks," valid and conclusive?

The contract further provides for the contingency of the abandonment of the use of the tracks by the plaintiff corporation, which is, " then the said Union Company will purchase their part of the same at a price to be fixed by three persons, one of whom shall be selected by each party." If therefore the present bill is to be regarded as an abandonment of the use of the track jointly owned, why does not the above provision operate?

The right of connection and running (if yet opened notwithstanding the contract) is wholly governed by the clauses in the several charters providing for final and conclusive action by the District Court, following a disagreement of the corporations.

It is suggested that the defendant cannot assert the want of power, under sec. 9, art. 17, of the constitution, of the plaintiff to lay an additional rail on Master Street. The Act of June 19th, 1871, and the decisions in Lejee *v.* Conti-

nental Railway, 10 Phila., 362, and Edgewood Railroad Appeal, 29 P. F. Smith, 257, confer on the defendant corporation the right to ask if plaintiff possesses the franchise on Master Street without the consent of the city of Philadelphia.

*George Biddle* and *George W. Biddle,* for the appellees.

The charter of the complainants clearly gives them power either to construct the railway upon Columbia Avenue themselves, or to run their cars on any railway there constructed by any other company. The complainants have not lost this right by non-user.

The case of North Branch Pass. R. W. Co. *v.* City Pass. R. W. Co., 2 Wr., 361, only decides that a license to run on the tracks of another company is revocable by the legislature. In this case the license has not been revoked. By the adoption of a single track on Columbia Avenue and Master Street, the complainants did not forfeit the right thereafter to change the number and location of their tracks: Railway Co. *v.* The City, 8 Norris, 210.

The agreement by its very terms contemplates that an end may be put to it at any time by the complainants.

No agreement of a permanent character can be made by a board of directors binding the company of which they are officers, and also future boards, to deal with their corporate property in any particular way, where the corporate property in question is of a public character, and the directors are bound to use it to the best advantage of the public: Green's Brice's Ultra Vires, p. 327.

No dispute as to terms has arisen, and consequently the objection to the jurisdiction of a court of chancery has no force in this stage of the cause: Union P. R. W. Co. *v.* Continental P. R. W. Co., 2 W. N. C., 286.

JANUARY 23D, 1882.—PER CURIAM: We affirm this decree upon the report of the learned master in the Court below.

Decree affirmed and appeal dismissed at the costs of the appellants.